LOWER MAKEFIELD TOWNSHIP,
Appellant

v.

The LANDS OF Chester DALGEWICZ and Christine Dalgewicz, husband and wife; John E. Dalgewicz; Chester W. Dalgewicz, Jane Cichocki; Richard K. Dalgewicz and Christine K. Newman, of Lower Makefield Township, County of Bucks Commonwealth of Pennsylvania.

Commonwealth Court of Pennsylvania.

Argued May 17, 2010.

Decided Sept. 1, 2010.

Allan D. Goulding, Jr. and Sean R. Sullivan, Morrisville, for appellant.

Marvin L. Wilenzik and James C. Crumlish, III, Blue Bell, for appellees, the Dalgewicz family.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and BUTLER, Judge.

OPINION BY Judge McGINLEY.

Lower Makefield Township (Township) appeals from the order of the Court of Common Pleas of Bucks County (trial court) which denied its motion for post trial relief following a jury verdict in this Eminent Domain case. The jury awarded the Dalgewicz family (Condemnees) $5,850,000 as just compensation for the taking of their 166–acre farm (Property) on December 6, 1996, for construction of a golf course.

On July 11, 2001, this Court ruled that the taking was for a legitimate public use. The parties proceeded to a Board of View hearing in May of 2003. The Board of View valued the property at $3,990,000. On February 20, 2004, Condemnees filed an appeal and the matter proceeded to a jury trial on the issue of damages.

The trial was held over six days in November 2008. There were a total of eleven witnesses.[1] At the conclusion of the trial, the jury determined that the Township owed Condemnees $5,850,000 as just compensation for the taking.

On appeal[2], the Township raises four issues. The first three issues are challenges to the trial court's evidentiary rulings regarding: (1) the admissibility of an executed Agreement of Sale between Condemnees and Toll Brothers for $7 million dated December 16, 1998; (2) the admissibility of an unaccepted offer made by Pulte

---

1. Witnesses included the owner of the Property, Chief Litigation Counsel for Toll Brothers, Inc., a landscape architect, three real estate appraisers, the Township Manager, two licensed professional engineers, the Township's Director of Zoning, Planning and Inspections, and a major land development consultant.

2. This Court's scope of review of the trial court's ruling on post trial motions is limited. In general this Court will not disturb the trial court's ruling unless the court manifestly abused its discretion or committed an error of law that affected the outcome of the case. *In Re Condemnation of 23.015 Acres*, 895 A.2d 76 (Pa.Cmwlth.2006).

Home Corporation in 1998 to purchase the Property for $8 million; and (3) the cross-examination of the Township's expert witness, Craig Gleason (Gleason), using a prior appraisal prepared for the Township by William Mount (Mount).

The fourth issue challenges the trial court's decision to try the case by jury where Condemnees mistakenly failed to formally request a jury trial in their Notice of Appeal from the Board of View.

## I.

### *Admissibility of December 16, 1998 Agreement of Sale Between Condemnees and Toll Brothers*

■ Toll Brothers, Inc. was a real estate development company which made an offer to purchase the Property, subject to the taking being overturned, for a conditional price dependent on the number of lots approved for development.[3] Condemnees' counsel introduced the Toll Agreement through the direct examination of Chet Dalgewicz (C. Dalgewicz) who testified that his family executed the Toll Brothers Agreement on December 16, 1998. Condemnees offered the December 1998 Toll Brothers Agreement as evidence of the value of the Property on the date of condemnation.

The Township argues in this appeal that the December 1998 Toll Agreement should have been excluded because it was executed more than two years after the taking in 1996. It maintains that fluctuations in market conditions between the time of the taking and the date of the agreement rendered the agreement irrelevant.

The Eminent Domain Code limits the admissibility of agreements of sale as evidence of the value of condemned property to agreements "made within a reasonable time *before or after* the condemnation." 26 Pa.C.S. § 1105 (Emphasis added).

■ It is within the trial court's discretion to admit an agreement of sale for the subject property, executed either before or after the taking, as evidence of a comparable sale where the court finds the agreement probative and relevant to determining the fair market value of the property on the date of condemnation. *Tedesco v. Municipal Authority of Hazle Township*, 799 A.2d 931 (Pa.Cmwlth.2002). The admission or exclusion of such evidence is within the sound discretion of the trial court, whose decisions will not be disturbed absent an abuse of discretion. *Lehigh–Northampton Airport Authority v. Fuller*, 862 A.2d 159 (Pa.Cmwlth.2004).

■ Pennsylvania law does not involve a bright line test to determine probative value, but instead permits a review of the totality of the circumstances surrounding the agreement to determine whether it constitutes a reasonable indicator of the value of the subject property. *In Re Redevelopment Authority of City of Harrisburg*, 35 Pa.Cmwlth. 415, 386 A.2d 1052 (1978). Factors which affect a trial court's determination include: the length of time between the date of the comparable agreement and the date of condemnation; fluctuation in the real estate market during that period; and changes in the character of the property over that time. *Harrisburg*, 386 A.2d at 1058. Whether particular sales or agreements are probative and relevant and thereby admissible are determined on a case-by-case basis. *Tedesco*.

**3.** The base price was $7 million for 100 lots. The price would increase or decrease in increments of $70,000 per lot for each lot approved more or less than the expected 100 lots. The Agreement set a price floor of $6,650,000. Toll Brothers could opt out of the agreement in the event that it was unable to obtain approval for at least 90 lots.

In *Tedesco*, the trial court admitted into evidence a comparable agreement of sale executed *six years prior* to the date of condemnation. Condemnees appealed and alleged that the trial court's admission of the agreement was reversible error. Condemnees argued, among other things, that changes in the real estate market during the period of time between the agreement of sale and the condemnation nullified the probative value of the agreement to determine the fair market value on the date of condemnation. This Court disagreed and found that while market fluctuation did occur, it did not preclude admission of a comparable sale where "the factual differences in the market were well developed for the jury through direct examination, competent cross-examination and ... other evidence." *Tedesco*, 799 A.2d at 936.

In the present controversy, as in *Tedesco*, issues regarding fluctuation in the market were properly addressed and challenged in extensive testimony at trial. Condemnees' Appraiser, George Sengpiel (Sengpiel), offered extensive testimony on direct examination regarding fluctuations in the Lower Makefield Township real estate market from the mid 1980's to the time of trial. Notes of Testimony, November 18, 2008, (N.T., 11/18/08) at 179–188; Reproduced Record (R.R.) at 437a–439a. The Township cross-examined Sengpiel about this market fluctuation, specifically with respect to how the changing market affected the Property's value between the date of the condemnation and the execution of the Toll Agreement. Notes of Testimony, November 19, 2008 (N.T., 11/19/08) at 113–124; R.R. at 477a–479a. The Township also cross-examined C. Dalgewicz regarding the change in market condi-

tions, and the fact that the market for raw land in Lower Makefield was increasing during the period from 1995 through 1998. N.T., 11/18/08, at 58–60; R.R. at 407a.

Through this evidence and testimony, the jury was provided the facts and context necessary to consider and adjust the value of the 1998 Toll Agreement to account for changes in the market. Pursuant to *Tedesco*, this Court finds the trial court committed no abuse of discretion when it admitted this evidence.[4]

## II.

### *Admissibility of 1998 Pulte "Letter of Intent" for $8 million (an Unaccepted Offer to Purchase)*

■ Next, the Township contends that the trial court erred when it admitted into evidence a written Letter of Intent, which it characterizes as a mere offer, dated December 1998, from Pulte Home Corporation, a national home development company, to purchase the Property for $8 million. Like the Toll Agreement, the Pulte Letter of Intent was dated two years after the taking.

Counsel for Condemnees introduced the Pulte Letter of Intent during direct examination of C. Dalgewicz. C. Dalgewicz confirmed that the Letter of Intent reflected an offer of $72,700 per lot for a minimum of 110 lots and included an analysis of market conditions. C. Dalgewicz explained that his family turned down the offer and was instead prepared to accept an offer from Toll Brothers for roughly $1 million less because the family felt more comfortable with Toll Brothers' "reputa-

---

4. This Court notes that in contradiction to its position that the December 1998 Toll Agreement was too remote in time to consider, the Township itself introduced into evidence a proposed offer from Toll Brothers dated June

1998, which was six months earlier to show that Toll Brothers offered Condemnees $61,000 per acre in June of 1998. N.T., 11/18/08, at 65–66; R.R. at 409a.

tion" and its "ability to deliver." N.T. 11/18/08, at 38; R.R. at 402a.

The Township's counsel objected to the introduction of the Pulte Letter of Intent because it was "an offer that has not produced an agreement of sale." N.T., 11/18/08, at 31; R.R. at 400a.

The trial court overruled the objection because both the Township and Condemnees stipulated as to the authenticity of the Pulte offer, and the traditional issues related to hearsay and the speculative nature of offers were not present.

On appeal, the Township contends that the offer was inadmissible to prove the value of the Property because it did not result in an agreement of sale and the Eminent Domain Code only permits a valuation expert to testify regarding "a sale or contract to sell" and does not include a mere offer to purchase. 26 Pa.C.S. § 1105. It maintains the offer was (1) irrelevant because a rejected offer is not probative of the fair market value of the property; and (2) hearsay.

Section 1105 of the Eminent Domain Code, 26 Pa.C.S. § 1105, provides that the testimony of a qualified valuation may include "[t]he price and other terms of any sale or contract to sell the condemned property."

■ Under Pennsylvania case law, testimony and evidence of an offer is generally permitted to show an interest and demand for the subject property. *Kelly v. Redevelopment Authority of Allegheny County*, 407 Pa. 415, 180 A.2d 39 (1962). However, our courts have stopped short of admitting the value of an offer due to the fact that such evidence often takes the form of hearsay and is often of such speculative nature as to be unreliable and irrelevant to establishing the fair market value of the property. *See Kelly; Saunders v. Commonwealth*, 345 Pa. 423, 29 A.2d 62 (1942);

*Whitcomb v. City of Philadelphia*, 264 Pa. 277, 107 A. 765 (1919).

Our Supreme Court in *Kelly* explained: "testimony that offers were made for a property condemned is admissible to show that the same is desirable and marketable; however, testimony of the amount of an offer by one who did make it would offend the 'hearsay' rule and the admission of the testimony by the offeror himself would lead to the investigation of collateral matters and confuse the main issue." *Kelly*, 407 Pa. at 416, 180 A.2d at 45. Our Supreme Court later explained in *Anderson v. Commonwealth Department of Highways*, 422 Pa. 1, 220 A.2d 643 (1966), that admission of valuation testimony based on offers which did not result in agreements of sale "would introduce wholly collateral issues as to the *bona fides* of the alleged offer, the conditions under which and by whom it was made and all of a host of other unrelated issues." *Anderson*, 422 Pa. at 4, 220 A.2d at 645.

Here, the trial court was well aware of the traditional prohibition of evidence surrounding the value contained in an offer. However, upon reflection, the court found that the underlying basis for prohibiting such testimony did not exist with respect to the Pulte Letter of Intent.

First, unlike in *Kelly* and *Anderson*, both Condemnees and the Township stipulated to the authenticity of the Letter of Intent, i.e., that it was drafted, sent and received in the ordinary course of business and therefore fell within the business records exception to the hearsay rule. *See* Pa.R.E. 803(6). Here, there was no evidence that indicated lack of trustworthiness of the source of the information or surrounding the preparation of the Letter of Intent. Condemnees provided sufficient information relating to the preparation and receipt of the Letter of Intent to justify a

presumption of its trustworthiness and offset the hearsay character of the evidence.

Further, it is well-settled that "[t]estimony as to an out of court statement, written or oral, is not hearsay if offered to prove, not that the content of the statement was true, but that the statement was made." *Bachman v. Artinger*, 285 Pa.Super. 57, 426 A.2d 702, 705 (1981). The Letter of Intent was introduced through Condemnees' counsel's questioning of C. Dalgewicz. The purpose of admitting the Letter was to prove the reasonableness of the Toll Agreement and to show that the demand of the price offered by multiple developers for the Dalgewicz farm was *bone fide*. During trial, the Township's position was that Toll could opt out of the agreement for any reason and that its offer of $7 million was unrealistic. Further, the Township argued that Toll had no intention of actually buying the Property but only wanted to reserve a right to the property. To rebut this assertion that $70,000 per lot was unrealistic, the Condemnees presented the Pulte Letter of Intent. Again, the Pulte offer was for $72,000 per lot and within the range of the December 1998 Toll Agreement.

The Court also rejects the Township's assertion that the Letter of Intent lacked any probative value as to the fair market value of the Property. There was no evidence that the offer was made in bad faith or for the purpose of artificially inflating the value of the Property. The evidence demonstrated that Pulte was a national home development company in the business of purchasing and developing large tracts of land similar to the Dalgewicz farm. The Township itself offered lengthy testimony from Robert Dwyer, a former real estate developer for Ryland Home Corporation which indicated the extensive and complex procedure to determine the value of a tract of land before submitting an offer. As the trial court astutely observed, this thorough valuation procedure removed the "uncertainty" and "speculation" associated with the accuracy and validity of the Pulte offer. Further, the Pulte Letter of Intent indicated the offeror's intention and ability to carry out the transaction. The Pulte offer was a firm offer that Condemnees could have accepted upon receipt. C. Dalgewicz testified that the strong reputation of the Toll Brothers was the only factor that prevented the family from accepting the Pulte offer. The Condemnees' decision to accept a similar offer in the midst of the competitive bidding process did not undermine the relevance of the Pulte offer. Because a sufficient foundation was laid to establish that the offer was made in good faith, by a party acquainted with the value of the Property, and of sufficient intention and ability to pay, this Court finds no error in the trial court's ruling that the Pulte Letter of Intent offer was relevant to a determination of the fair market value of the Property.

■ This Court's decision does not alter the general rule that offers to purchase are generally inadmissible because of their uncertainty, speculative nature and failure to form any solid foundation for determining the value of land. Rather, it recognizes an exception to the general rule in exceptional cases, such as this one, where the evidence establishes the foundation of a *bona fide* offer so firmly and completely that the trial court did not abuse its discretion in receiving the offer into evidence.

This Court has found no Pennsylvania cases directly on point. However, the Supreme Court of Illinois' decision in *City of Chicago v. Lehmann*, 262 Ill. 468, 104 N.E. 829 (1914) lends support to the analysis. In *Lehmann*, Augusta Lehmann owned four lots in the City of Chicago which were condemned for a school. At the trial on

damages, Lehmann attempted to introduce evidence of three offers made through realtors to pay $150 per foot for parts of the property with frontage. The trial court ruled the evidence inadmissible because, *inter alia*, the evidence was not relevant or material. The jury awarded Lehmann $17,000 damages and he appealed.

One of the issues on appeal concerned the Illinois trial court's exclusion of the offers. The Illinois Supreme Court reversed and ruled the evidence admissible because, under the circumstances, the offers "proved to be *bona fide*" by persons who were willing and able to buy the property. *Lehmann*, 104 N.E. at 831. Other courts have also recognized that there may be exceptional cases when a sufficient foundation is laid. *See Hardaway v. City of Des Moines*, 166 N.W.2d 578 (Iowa 1969); *Virgin Islands Housing Authority v. 15.5521 U.S. Acres of Land in St. Croix, Virgin Islands*, 230 F.Supp. 845 (D.C.Virgin Islands 1964); *See also Tedesco*, which recognized that "exceptions to the general rule have been developed." 799 A.2d at 934.

Here, the trial court's ruling was based on sound and perceptive reasoning that the Pulte offer was evidence of a *bona fide* attempt to purchase the property and, as such fairly indicated the market value of the tract. The trial court declined to apply the hard and fast rule advocated by the Township and instead looked to the underlying principles for excluding evidence of unaccepted offers. Concluding that the "traditional concerns regarding hearsay and collateral matters related to offers were not present" the trial court allowed the evidence. Evidentiary rulings will not be set aside unless palpably wrong. *Tedesco*, 799 A.2d at 936. This Court will not hold as a matter of law that the trial court erred when it clearly considered the soundness and legitimacy of the Pulte Letter of Intent in conjunction with the other evidence of contemporaneous offers and concluded that it was a reliable and competent indicator of fair market value.

Moreover, the Township has not demonstrated any prejudice from the introduction of the Pulte Letter of Intent. The Pulte offer of $8 million was well above the jury verdict of $5,850,000. Further, the information contained therein was essentially established by other competent evidence. The Township itself introduced the proposed Toll Brothers Agreement which offered $70,000 per acre. The admission of the Pulte offer was buttressed by other competent evidence and was properly admitted because it tended to prove the particular fact for which the Pulte offer was admitted. *Printed Terry Finishing Company v. City of Lebanon*, 372 A.2d 460 (Pa.Cmwlth.1977).

Accordingly, the Court must conclude that the admission of the Pulte Letter of Intent did not amount to reversible error.

### III.

### *Cross–Examination of Gleason regarding the Mount Appraisal*

William Mount authored an appraisal for the Township on December 18, 1996. The Township voiced a hearsay objection to the admission of the Mount appraisal or its findings because Mount did not testify as an expert at trial.

Condemnees' counsel indicated that he intended to use the report to cross-examine the Township's existing appraiser, Craig Gleason. The trial court ruled at trial that Gleason could be cross-examined with the Mount report because he admitted reviewing and considering Mount's appraisal in preparation for his expert testimony. Notes of Testimony, November 20,

2008 (N.T. 11/20/08) at 299–300; R.R. at 587a. Pursuant to the trial court's ruling, Gleason acknowledged that Mount had appraised the Property at $4,577,000. N.T., 11/20/08 at 304; R.R. at 588a.

 Traditionally, an expert report constitutes inadmissible hearsay unless the expert who prepared the report is available for cross-examination regarding the accuracy and reliability of his opinion. Pa. R.E. 810(c); *Columbia Gas Transmission Corp. v. Piper,* 150 Pa.Cmwlth. 404, 615 A.2d 979 (1992). There is a well-settled exception to this hearsay rule which permits experts to testify regarding reports of others which are not in evidence, but upon which they relied in reaching a professional conclusion. *Primavera v. Celotex Corp.,* 415 Pa.Super. 41, 608 A.2d 515 (1992). The Township contends that this exception does not apply and Gleason's expert opinion on cross-examination, therefore, constituted inadmissible hearsay which the jury should not have been permitted to consider.

Gleason testified that the Township's counsel was given the Mount appraisal to review in preparation for his cross-examination. N.T., 11/20/08 at 283; R.R. at 583a. This means Gleason received the report from the Township's counsel *who directed him to review it prior to his testimony specifically for the purpose of cross-examination.* The Township conducted a thorough redirect examination of Gleason who explained to the jury why, in his opinion, he believed the Mount appraisal was too high. Further, Gleason testified that Mount's appraisal was very similar to his in methodology. However, he also believed Mount incorrectly assumed that 112 lots would be approved and developed on the Property. Gleason contemplated only 90 lots would be approved. Gleason then recalculated Mount's appraisal to coincide with his projection of only 90 lots. This resulted in an adjustment of value from $4,577,000 to $3,460,000. Notes of Testimony, November 21, 2008 (N.T. 11/21/08) at 76–77; R.R. at 612a. Gleason appraised the Property on the date of the taking at $3,050,000. Thus, Gleason, in effect, used Mount's report during his testimony to reinforce his own valuation of the property. Again, the Township fails to articulate the prejudice it suffered as the result of the admission of Mount's report.

The record demonstrates that Gleason and Mount valued the property almost identically on a per-acre basis. Once Gleason adjusted the assumed number of lots he believed would be approved Mount's appraisal yielded an almost identical valuation to the appraisal of Gleason. Further, other evidence was presented that the value was significantly higher than the dollar amount in the Mount report. Mount's valuation of the Property was also substantially less than the jury verdict. Therefore, it is fair to deduce that Mount's report did not prejudice the Township in any way, but rather buttressed the Township's assertions as to the value of the Property. *B & L Asphalt Industries, Inc. v. Fusco,* 753 A.2d 264 (Pa.Super.2000) (an evidentiary ruling that does not affect the verdict will not provide a basis for disturbing the fact-finder's judgment).

Therefore, the Court finds that the cross-examination of Gleason regarding the Mount appraisal did not constitute reversible error on the part of the trial court.

## IV.

### *Confirmation of a Jury Trial*

 The Township next argues that Condemnees waived their right to a jury trial because they failed to make a timely written demand for a jury in their appeal from the decision of the Board of View.

Section 517 of the Eminent Domain Code, 26 Pa.C.S. § 517, states that "[i]f appellant desires a jury trial, he shall at the time of filing the appeal, endorse thereon, or file separately, a demand for a jury trial signed by him or counsel." This Section further provides that "if no party makes a demand for a jury trial as set forth herein, the right to a jury trial shall be deemed to have been waived and the court shall try the case without a jury."

Here, a review of the record shows that Township was represented by Jeffrey Garton, Esquire throughout the Board of View proceedings. Condemnees filed their appeal from the Board of View to the trial court on February 20, 2004. Condemnees did not formally request a jury trial.

However, the record shows that for eighteen months following the appeal, while the Township was represented by Attorney Garton, no question of a jury trial existed. Both parties actively worked with the Court Administrator to schedule a jury trial. The record reflects that Condemnees were in touch with the Court Administrator's office to obtain late February and early March trial dates. Condemnees' counsel was given March 6, 7, and 8 as available dates. On January 10, 2006, Condemnees' counsel wrote the Bucks County Deputy Court Administrator concerning the March availability of jury trial dates and specifically stated that he was "prepared to praecipe the case for special listing for those days" because they were "part of [the] jury trial term." See Letter from Marvin Wilenzik, Esquire to Deputy Court Administrator, January 10, 2006, at 1; R.R. at 50a. Thus, the trial court and counsel for the parties were well aware of Condemnees' desire for a jury trial.

The Township hired new counsel in January 2006, and for the first time since the appeal, challenged Condemnees' right to a jury trial because a written request was not made on the Notice of Appeal. In support of its position that a jury trial should be denied, the Township asserted that "a bench trial is much more economical and convenient to all concerned, and the complexity of the issues and testimony also make a bench trial the more appropriate means of resolving the case." Letter from David Truelove, Esquire to Marvin Wilenzik, Esquire, August 17, 2006 at 1; R.R. at 70a.

On August 24, 2006, Condemnees filed a Petition to Confirm Jury Trial or Alternatively to Perfect Appeal. In support of their Petition, Condemnees presented evidence of the parties' mutual understanding that Condemnees' desired a jury trial, including a letter from Attorney Garton which indicated that he was "always aware of the intent that the matter be tried with a jury" and that he "certainly acquiesced with respect to that initiative." Letter from Jeffrey Garton, Esquire to Marvin Wilenzik, Esquire, August 7, 2006, at 1–2; R.R. at 53a–54a. Attorney Garton admitted that he "participate[d] in several conversations with [the Deputy Court Administrator] concerning scheduling" a jury trial and wrote several letters to Condemnees wherein he referred to a "trial by jury." *Id.* On July 17, 2007, the trial court granted Condemnees' Petition and held that a jury trial was proper.

Despite the Township's argument to the contrary, this Court is not convinced that Section 517 of the Eminent Domain Code, 26 Pa.C.S. § 517, was meant to be construed so rigidly so as to deprive a party of a constitutional right; especially when, as here, the purpose of the provision was otherwise satisfied and the oversight was not a result of questionable conduct or bad faith.

██ The procedural aspects of the Eminent Domain Code are routinely liberally construed in the interests of justice and equity. For example, our Supreme Court in *In re Langhorne Spring Water Company,* 437 Pa. 298, 263 A.2d 357 (1970), refused to quash an appeal where the appellant failed to file a timely notice of appeal and affidavit of service pursuant to former Section 516(b) of the Eminent Domain Code, 26 Pa.C.S. § 1–516(b), which stated: "[t]he appellant shall serve a copy of the appeal on all other parties within five days after filing the appeal. Proof of service of a copy of the appeal shall be filed by the appellant." Despite the presence of the language "shall serve" the Supreme Court held that the legislature intended that Section 516(b) was directory as opposed to mandatory in nature. Construing the language of Section 516(b) liberally the Supreme Court found that appellant's failure was insufficient to quash the appeal in light of the fact that the appellee knew an appeal had been filed and was not prejudiced in any manner by appellant's actions.

Here, counsel for the Township was advised and knew of the desire for a jury trial and acted with full awareness of the request for a jury trial. Again, the purpose of the demand is to assure the parties and court are aware of the preference for a jury trial. Because the Township's counsel was fully aware of Condemnees' desire for a jury trial there was no prejudice in failing to note it on the Notice of Appeal. To reverse a jury verdict following a full fledged six day jury trial because of this procedural mishap would serve absolutely no purpose whatsoever under the Eminent Domain Code.

Moreover, the Township has not explained to the satisfaction of this Court how it was harmed, prejudiced or disadvantaged by a jury trial. There is no inherent prejudice in proceeding to trial by jury as opposed to trial before a judge. *Dauphin Deposit Bank and Trust Co. v. Pifer,* 383 Pa.Super. 275, 556 A.2d 904 (1989). Again, the Township has presented no good reason to reverse the trial court's decision.

The order of the trial court is affirmed.

### *ORDER*

AND NOW, this 1st day of September, 2010, the order of the Court of Common Pleas of Bucks County in the above-captioned case is hereby affirmed.