# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Condemnation by the : 
Redevelopment Authority of the : 
City of York : 
 : 
Appropriating in Fee Simple : 
Certain Lands of John E. and Joyce E. : 
Gearhart : No. 186 C.D. 2017
 : Argued: December 4, 2017
Located at 319 Chestnut Street, in the : 
City of York, York County, Pennsylvania : 
Parcel No. 12-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.00-00000 : 
 : 
Appeal of: Redevelopment Authority of the : 
City of York : 


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                              **FILED: March 13, 2018**


The Redevelopment Authority of the City of York (Authority) appeals from a judgment entered by the Court of Common Pleas of York County (Trial Court) following a jury trial in which John and Joyce Gearhart (Condemnees) were awarded $1,250,000 as just compensation for property they owned that the Authority condemned. For the reasons set forth below, we conclude that the issues raised by the Authority do not warrant reversal of the judgment and we therefore affirm the Trial Court's order denying the Authority's post-trial motion.

The property at issue in this case is a 2.93 acre site in the City of York on which the former York County Prison building is situated (Property). (Notes of Trial Testimony (N.T.) at 531 (Trial Stipulations), Reproduced Record (R.R.) 537a.) Condemnees purchased the Property from York County in 1982 and have not occupied the Property or used the former prison building since purchase. (*Id.*)

In 2013, the Authority designated the Property as blighted pursuant to Section 205 of the Eminent Domain Code[1] and Section 12.1 of the Urban Redevelopment Law.[2] The Authority filed a declaration of taking on February 21, 2014, and possession of the Property was transferred to the Authority on May 28, 2014. The Trial Court appointed a Board of Viewers, which issued a report on August 25, 2014. The Board of Viewers determined based on expert appraisals presented by the parties that the Property had a value of $292,000 but that it would require costs of $229,536 for the removal of an oil tank and asbestos materials and lead paint remediation so that any productive use could be made of the Property. (Report of Viewers at 5-12, R.R. 621a-628a.) Subtracting the costs to cure hazardous conditions from the appraisal value of the Property, the Board of Viewers arrived at a fair market value of $62,464, which it rounded up to $65,000. (Report of Viewers at 13, R.R. 629a.)

Condemnees appealed the Board of Viewers' report, demanding a jury trial. (Notice of Appeal, R.R. 633a.) The trial began on July 18, 2016 and concluded on July 21, 2016 when the jury returned its verdict. On July 20, 2016, the jury viewed the Property in accordance with Section 1103 of the Eminent Domain Code, 26 Pa. C.S. § 1103. At trial, both parties relied on the testimony of a licensed real

---

[1] 26 Pa. C.S. § 205.

[2] Act of May 24, 1945, P.L. 991, added by the Act of June 23, 1978, P.L. 556, *as amended*, 35 P.S. § 1712.1.

2

estate appraiser as a qualified valuation expert to give their opinion regarding the fair market value as of the date of condemnation. Both of the experts employed the sales comparison approach to arrive at their valuation estimate using recent sales of nearby comparable parcels of land to provide a benchmark for their valuation opinion. Condemnees' expert valued the Property at $1,250,000, which accounted for costs related to asbestos remediation and demolition of the prison building to allow for the development of the entire 2.93 acre lot. Among the sales comparison properties that Condemnees' expert used was an assemblage of 20 small properties totaling 1.16 acres that Think Loud, a developer that contracted with the Authority to purchase the Property following condemnation, had acquired in the vicinity of the Property between June 2013 and June 2014. (N.T. at 149-52, R.R. 155a-158a.) The Authority's valuation expert valued the Property at $62,000, which accounted for the costs to cure the hazardous conditions in the prison building but did not include the demolition of the building; according to the Authority's expert, the value of the building itself had a negative value factoring in the remediation costs, but this was balanced out by the $170,000 value of the remaining 2.44 acres of the Property.[3]

Following trial, the Authority filed a motion for post-trial relief in which it raised eleven errors, including the three issues raised in this appeal, that it asserted warranted a new trial. The Trial Court rejected each of these issues in a lengthy January 12, 2017 opinion. On January 17, 2017, the Trial Court entered judgment in favor of Condemnees in the amount of $1,254,000 based upon the jury award of $1,250,000 and the stipulated amount of attorney fees of $4,000. (Praecipe for Entry of Judgment, R.R. 968a-969a; Pre-trial Memoranda, Stipulations of Facts

---

[3] The Authority's valuation expert opined that the prison building had a value of $122,000 with remediation costs of $230,000 for a net negative value of $108,000, while the remaining portion of the Property had a value of $170,000. (N.T. at 478-80, R.R. 484a-486a.)

¶5, R.R. 639a, 646a.) The Authority filed a timely notice of appeal of the denial of its post-trial motion.

The Authority raises three issues on appeal, all of which allege errors in the admission of evidence at trial. In eminent domain cases, this Court reviews whether the trial court committed an abuse of discretion or an error of law. *Lang v. Department of Transportation*, 135 A.3d 225, 228 n.8 (Pa. Cmwlth. 2016). The admission or exclusion of evidence is within the sound discretion of the trial court, whose decision will not be disturbed absent an abuse of discretion. *Lower Makefield Township v. Lands of Dalgewicz*, 4 A.3d 1114, 1117 (Pa. Cmwlth. 2010), *aff'd* 67 A.3d 772 (Pa. 2013) (*Lower Makefield Township I*); *Lehigh–Northampton Airport Authority v. Fuller,* 862 A.2d 159, 168 (Pa. Cmwlth. 2004).

First, the Authority challenges the Trial Court's decision to restrict the jury view to the exterior of the prison building. Prior to trial, Condemnees filed a motion *in limine* in which it sought, *inter alia*, to prevent the jurors from entering the building during their view of the Property, arguing that the interior condition was irrelevant to the proceeding and that the building was unsafe with no electric service, unprotected openings in the floors and stairways and scattered debris, including lead paint flakes, present throughout the building. (Condemnees Motion *In Limine* ¶¶7, 23-26, R.R. 686a-687a, 690a-691a.) The Authority opposed the motion, arguing that there was no legal foundation for Condemnees' request to limit the view. (Authority Answer to Motion *In Limine* at 2, R.R. 712a.) On July 14, 2016, the Trial Court entered an order granting Condemnees' request to restrict the jury view to the exterior of the prison building with the proviso that both parties were permitted to present additional exhibits depicting the interior of the building that had not been previously identified in their pre-trial memoranda. (R.R. 860a.) On the first day of

trial prior to the jury being sworn in, the Trial Court judge further stated that he would permit the jury to look in through the open door of the building and explained his ruling restricting the jury view as "erring on the side of the angels with regard to the safety of the jury." (N.T. at 11-12, R.R. 17a-18a.)

The Authority argues that the Trial Court's limitation of the view to the exterior of the prison building violated the Authority's right to a jury view as set forth in the Eminent Domain Code. The Authority asserts that the Code does not recognize a safety exception and therefore the Trial Court erred in granting the Condemnees' request. The Authority contends that, even if the Trial Court harbored concerns regarding the safety of the interior of the building, it should have held an evidentiary hearing to determine whether the safety concerns were founded. The Authority notes that there was no argument that the prison building was structurally unsound, and it was established at trial that the building was in fact structurally sound. Furthermore, the Authority faults the Trial Court for failing to explore options of providing the jurors with safety apparel, such as surgical masks and booties, so that the jury could view the interior of the prison building but avoid exposure to the hazardous conditions. Moreover, the Authority argues that the photographs it produced were an inadequate substitute for an in-person inspection of the interior of the building. The Authority argues that it was harmed by the Trial Court's decision to restrict the jury view because it produced extensive evidence at trial regarding the cost and process to renovate the prison building and the jury was deprived of the ability to fully appreciate the weight of the Authority's evidence and argument.

Section 1103 of the Eminent Domain Code expressly provides that either the condemnor or condemnee may demand a jury view:

> At the trial in court on appeal…[e]ither party may, as a matter of right, have the jury or the judge in a trial without a jury view the property involved, notwithstanding that structures have been demolished or the site altered, and the view shall be evidentiary. If the trial is with a jury, the trial judge shall accompany the jury on the view.

26 Pa. C.S. § 1103(1). When a jury views the premises, a reviewing court must give special weight to the jury's award. *Tedesco v. Municipal Authority of Hazle Township*, 799 A.2d 931, 938 (Pa. Cmwlth. 2002); *George v. Department of Transportation*, 650 A.2d 1217, 1221 (Pa. Cmwlth. 1994). Indeed, the jury may, in such cases, disregard the expert testimony entirely and arrive at its own valuation of the condemned property. *Tedesco*, 799 A.2d at 938; *George*, 650 A.2d at 1221-22.

Nevertheless, the Authority's contention that a trial court lacks any discretion in determining how a jury view is conducted lacks any support in either the Eminent Domain Code or case law. Such an interpretation of the Code would run contrary to a trial judge's discretion in determining the admissibility of evidence and directing the conduct of a trial. *See Lower Makefield Township I*, 4 A.3d at 1117; *Crystal Forest Associates, LP v. Buckingham Township Supervisors*, 872 A.2d 206, 214 (Pa. Cmwlth. 2005) ("Conduct of a trial is within the discretion of the trial judge and the court's exercise of its discretion will not be reversed in the absence of abuse."). Furthermore, the absolute right to a jury view that the Authority proposes would prevent a trial court judge from imposing any reasonable precautionary measures in cases such as this where the well-being of the jury may be at risk. Accordingly, we conclude that a trial court judge must have the discretion to modify or limit a jury view based on the specific circumstances and factors relevant to each case, including the question of the safety of the jurors. This holding is consistent with our opinion in *Whittaker v. Department of Transportation*, 406 A.2d 819 (Pa. Cmwlth. 1979), in which we addressed an argument that a new trial was warranted

6

when the trial court judge, because of deep snow covering the condemned property, limited the jury view to a bus trip on the roads directly adjacent to the property and a stop at a high point on the road to view the property and surrounding acreage from a distance. *Id*. at 821. We held that the trial court did not abuse its discretion by not granting a continuance in the trial to allow for the jury view to be conducted on a date when the weather had improved. *Id*.

We conclude that the Trial Court here did not abuse its discretion by limiting the jury view of the Property. The issues with the prison building that lead the Trial Court to its determination are not in dispute: the prison building had been abandoned since 1979 and was in substantial disrepair and required extensive work to cure the hazardous conditions including the removal or encapsulation of lead paint throughout the building. Thus, it was reasonable for the Trial Court, in the interest of protecting the jurors' safety, to restrict the jurors' view of the Property to the exterior of the building while allowing the parties to introduce exhibits depicting the interior of the building. Indeed, the Authority took advantage of the opportunity to present numerous photographic exhibits demonstrating the dilapidated state of the interior of the building when it was condemned. While the Authority asserts that the Trial Court should have held an evidentiary hearing to probe whether safety measures were required, the Authority did not request an evidentiary hearing either in its response to Condemnees' motion *in limine* or when the issue was discussed at trial. We similarly reject the Authority's argument that the Trial Court should have ordered that the jury view of the interior of the prison building proceed but with the jurors wearing surgical masks and booties as it did not suggest these safety precautions prior to or at trial.

Next, the Authority argues that the Trial Court erred by permitting Condemnees to submit into evidence a July 11, 2014 "Redevelopment Agreement" between the Authority and Think Loud, in which Think Loud authorized the Authority to acquire the Property on its behalf and agreed to fully fund the cost of acquisition of the Property, including eminent domain costs.[4] The Authority filed a motion *in limine* seeking to preclude Condemnees from offering any evidence of the Redevelopment Agreement, which was discussed in and attached to Condemnees' valuation expert's appraisal report. (Authority Motion *In Limine*, R.R. 656a-660a.) The Authority argued that the Redevelopment Agreement was not relevant because it post-dated the condemnation and was not central to the question of fair market value of the Property and also that the agreement would be prejudicial because the developer and its activities in the City of York were well-known.[5] (Authority Motion *In Limine*, R.R. 656a-660a.) In its July 14, 2016 order, the Trial Court denied the Authority's motion *in limine*. (R.R. 859a.) In its opinion denying the Authority's post-trial motion, the Trial Court explained that the Redevelopment Agreement was

---

[4] The Redevelopment Agreement provides:

> Funding. Developer [Think Loud] agrees to fund the cost of acquisition by RDA [the Authority] and the disposition to Developer of the Property from its funds, including paying the owner of each property fair market value, appraisal, engineer fees, and recording charges, or otherwise negotiate a mutually acceptable fee. RDA will transfer the title of each already acquired property to Developer for the sum of $1.00.

> Reimbursement of RDA. Developer agrees to reimburse RDA for its legal services and costs of eminent domain under this Agreement required to obtain clear title to the Property and convey the Property to Developer, including all acquisition costs.

(Redevelopment Agreement at 3, R.R. 682a (emphasis in original).)

[5] Several of the principals in Think Loud were members of the local rock band "Live," and Think Loud had announced efforts to engage in several redevelopment projects with the aim of revitalizing distressed areas in the City of York. (Condemnees Motion for Leave to Amend Pre-trial Memorandum, Ex. E, R.R. 775a-780a.)

admissible pursuant to Section 1105(2)(i) of the Eminent Domain Code, 26 Pa. C.S. § 1105(2)(i), as a contract to sell the Property entered into within a reasonable time after the date of the condemnation. (Jan. 9, 2017 Trial Court Op. at 11.)

The Authority argues on appeal that the Redevelopment Agreement was not a contract to sell real property and therefore was not relevant to the issue of determining the fair market value of the Property, the central issue in this matter. The Authority contends that the Redevelopment Agreement did not have a tendency to assist the jury because it did not set forth a specific price to be paid by Think Loud for the Property and because it was dated five months after the date of condemnation. Instead, the Authority argues that the Redevelopment Agreement is a "redevelopment contract," which pursuant to the Urban Redevelopment Law furthers that legislation's objectives of promoting urban renewal and reducing blight. The Authority asserts that a redevelopment contract is intended to memorialize the transfer of real estate but otherwise has a distinctly different legal purpose from a contract to sell, which represents the mutually agreed upon value of what a willing buyer would pay to a willing seller. The Authority further asserts that, as a redevelopment authority, it does not act as a "seller" with a profit motive but instead it was chartered for the specific purpose of eliminating blight in the City of York. Finally, the Authority argues that the introduction of the Redevelopment Agreement into the evidence was highly prejudicial to its case because it revealed the Authority's funding source and allowed the Condemnees to characterize the agreement as a "blank check" by Think Loud for the acquisition of the Property.[6]

---

[6] During cross-examination, Condemnees' valuation expert stated that the Redevelopment Agreement was a "blank check." (N.T. at 250, R.R. 256a.) Condemnees' counsel referred to the Redevelopment Agreement as a "blank check" again in cross-examination of the Authority's valuation expert and during his closing argument. (N.T. at 484, 559, 567, R.R. 490a, 565a, 573a.)

9

The Eminent Domain Code expressly permits a valuation expert to testify regarding the terms of a sale or a contract to sell condemned property:

> (2) A qualified valuation expert may, on direct or cross-examination, testify in detail as to the valuation of the property on a comparable market value, reproduction cost or capitalization basis, which testimony may include, but shall not be limited to, the following:
>
> > (i) The price and other terms of any sale or contract to sell the condemned property or comparable property made within a reasonable time before or after the date of condemnation.

26 Pa. C.S. § 1105(2)(i). In *Lower Makefield Township v. Lands of Chester Dalgewicz*, 67 A.3d 772 (Pa. 2013) (*Lower Makefield Township II*), our Supreme Court explained that while the Code delineates an appraiser's ability to testify regarding a sale or an agreement of sale, the admissibility of the document itself must be analyzed pursuant to the rules of evidence. 67 A.3d at 776 n.6 ("The Code speaks only of the admissibility of 'testimony,' and does not address the admissibility of the underlying documents. Such documentation is admissible as provided by general evidentiary rules.").

"The fundamental consideration in reviewing the trial court's decision regarding the admission of evidence is its relevance." *Harsh v. Petroll*, 840 A.2d 404, 430 (Pa. Cmwlth. 2003). "Evidence is relevant if: it (a) has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa. R.E. 401. A court may exclude relevant evidence, however, where its probative value is outweighed by unfair prejudice, which is "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa. R.E. 403, Comment. "To constitute reversible error, a ruling on

10

evidence must be...harmful to the party complaining." *Hart v. W.H. Stewart, Inc.,* 564 A.2d 1250, 1252 (Pa.1989); *see also Lehigh–Northampton Airport Authority,* 862 A.2d at 168. In the case of a contract to sell property in eminent domain matters, the principal issue before the trial court in determining the admissibility of the contract is whether it is relevant to determining the fair market value of the property at issue on the date of condemnation. *Lower Makefield Township I*, 4 A.3d at 1117. Whether an agreement of sale is relevant and therefore admissible is determined on a case-by-case basis. *Lower Makefield Township I*, 4 A.3d at 1117; *Tedesco*, 799 A.2d at 936.

The Trial Court here did not abuse its discretion by permitting testimony regarding the Redevelopment Agreement and the admission into evidence of the agreement itself, as a "contract to sell" the condemned property under the Eminent Domain Code. 26 Pa. C.S. § 1105(2)(i). Under the agreement, Think Loud authorized the Authority to acquire good and marketable title to the Property on its behalf, whether through arm's length negotiation or if necessary by condemnation of the Property, and then Think Loud agreed to "fund the cost of acquisition" of the Property. (Redevelopment Agreement at 2-3, R.R. 681a-682a.) The costs that Think Loud agreed to reimburse included payment of fair market value, appraisal, engineering and legal fees, recording charges and "costs of eminent domain under this Agreement required to obtain clear title to the Property and convey the Property to [Think Loud], including all acquisition costs." (*Id*. at 3, R.R. 682a.) Upon payment of these fees and reimbursement, the Authority would transfer title of the Property to Think Loud for the sum of $1.00. (*Id*.) The Redevelopment Agreement thus clearly sets forth the essential elements of an agreement to sell real property, namely the promise by the seller to convey title of the property to the buyer and a

11

description of what the buyer would pay for the purchase. Indeed, two of the Authority's witnesses, the Authority's qualified valuation expert and a real estate appraiser who performed a review of Condemnees' valuation expert's report, each concurred that the agreement was an agreement of sale of the Property. (N.T. at 407-08, 483-84, R.R. 413a-414a, 489a-490a.)

While the Redevelopment Agreement did not set forth a specific price to be paid for the Property, this issue did not prevent the Trial Court from admitting the agreement as probative of the Property's value under the Eminent Domain Code. The Code does not restrict a qualified valuation expert from testifying only as to the price of the condemned property in the sale agreement but also regarding "other terms" that are probative of the fair market value of the property. 26 Pa. C.S. § 1105(2)(i). Importantly, the Redevelopment Agreement was admitted in conjunction with the testimony of Condemnees' valuation expert that Think Loud had purchased other properties in the immediate vicinity of the Property just before and just after the date of condemnation; as Condemnees' expert explained, the Redevelopment Agreement showed that Think Loud would pay the same price per acre rate for the Property as it did for the other nearby parcels it purchased. (N.T. at 128, R.R. 134a.) Furthermore, the fact that the Redevelopment Agreement was contingent on the Authority first acquiring title itself does not change our conclusion that the agreement was admissible. In *Tedesco*, we held that an option contract that did not provide for the imminent and definite sale of the condemned property but instead offered a unilateral option to purchase the property in the future at a fixed price was admissible, noting that the Code refers to a "contract to sell" not a "contract of sale." 799 A.2d at 933, 935.

12

We also reject the Authority's argument that the Redevelopment Agreement cannot be a contract to sell the Property because it is instead a "redevelopment contract" that the Urban Redevelopment Law specifically mandates redevelopment authorities to enter into with redevelopers for each proposed project. The Redevelopment Agreement here bears no similarity to the redevelopment contracts described in the Urban Redevelopment Law. Section 11 of that legislation sets forth various requirements for a redevelopment contract, but the Redevelopment Agreement at most contains one of these requirements, a statement of the consideration to be paid by the redeveloper to the authority, and even this is debatable because no specific price is set forth in the agreement. Section 11(a)(6) of the Urban Redevelopment Law, *as amended*, 35 P.S. § 1711(a)(6). Mandatory provisions of a redevelopment contract that are absent from the Redevelopment Agreement include: a statement of use for the redevelopment project; a guaranty of completion of the project within a specified time; plans for the character and construction of the project; and a covenant that the project will be used in a non-discriminatory fashion. 35 P.S. § 1711(a)(1)-(4), (7).

In addition, we conclude that the Redevelopment Agreement clearly meets the requirement of the Eminent Domain Code that it was "made within a reasonable time before or after the date of condemnation." 26 Pa. C.S. § 1105(2)(i). This Court has permitted testimony regarding agreements as long as four and six years before the date of condemnation and two years after condemnation. *Lower Makefield Township I*, 4 A.3d at 1117-18 (more than two years after the date of condemnation); *Tedesco*, 799 A.2d at 936 (six years prior to the date of condemnation); *Whittaker*, 406 A.2d at 821-22 (3 years and 9 months prior to condemnation). The principal factors that affect a determination of whether the sale

13

agreement is close enough in time to be probative of the fair market value of condemned property are whether there has been a material change in the real estate market or to the character of the property. *Lower Makefield Township I*, 4 A.3d at 1117; *In re Redevelopment Authority of City of Harrisburg*, 386 A.2d 1052, 1058 (Pa. Cmwlth. 1978). Here, the Redevelopment Agreement was executed on July 11, 2014 only five months after the filing of the declaration of taking, and no evidence was presented of fluctuations in the market or alterations to the Property during those five months.

Lastly, we conclude that the Authority was not unfairly prejudiced by the characterization of the agreement as a "blank check" from Think Loud to the Authority for the Property. First, the Authority did not object to the use of the phrase "blank check" in reference to the Redevelopment Agreement during trial, and therefore this issue is waived. *Craley v. Jet Equipment & Tools, Inc.*, 778 A.2d 701, 706 (Pa. Super. 2001) (failure to make a timely objection during trial to a prejudicial comment results in waiver). Moreover, we cannot say that the application of this description to the agreement was so inaccurate, misleading or confusing as to be prejudicial to the Authority's case. As the Authority contends, the Agreement provides that the Authority will transfer title to the Property to Think Loud for $1.00, but it also clearly states that Think Loud "agrees to fund the cost of acquisition by" the Authority, including fair market value, and reimburse "all acquisition costs," including the "costs of eminent domain," with no set maximum reimbursement by Think Loud. (Redevelopment Agreement at 3, R.R. 682a.)

The Authority's final argument on appeal is that the Trial Court abused its discretion by permitting the introduction of a November 28, 2013 application to the Commonwealth for a City Revitalization and Improvement Zone, or CRIZ, to be

14

formed in the City of York.[7]  (CRIZ Application, R.R. 727a-731a.)  The CRIZ application stated that Think Loud was interested in acquiring the Property to build a $40 million data center that was related to a separate proposal by Think Loud and another developer, United Fiber and Data, to build a 300-mile fiber-optic line from Washington, D.C., to New York City that would pass through the City of York.[8] Condemnees filed a motion to amend their pre-trial memorandum to add the CRIZ application as a trial exhibit, which the Trial Court granted in its July 14, 2016 order. (Motion to Amend Pre-Trial Memorandum, R.R. 715a-721a; July 14, 2016 Trial Court Order, R.R. 860a.)

The Authority argues that the CRIZ application was not relevant evidence because it was not drafted by the Authority and it did not demonstrate a sale or transfer of the Property by the Authority to Think Loud.  Noting that the

---

[7] The CRIZ program was created by the Act of July 9, 2013, P.L. 270, *as amended*, 72 P.S. §§ 8801-C–8819-C, to allow cities, municipalities or home rule counties to apply to the Department of Revenue and Department of Community and Economic Development to create zones of up-to 130 acres; a portion of state and local tax revenue from the properties within the CRIZ would be directed to a special fund to pay for acquiring land, improvement projects, infrastructure projects and debt service on bonds.

[8] The CRIZ application states:

One of the most anticipated CRIZ developments is a $40 million fortified data center being built by Think Loud Development and United Fiber and Data (UFD).  UFD, a York company, is building the 300-mile fiber-optic network, a $200 million project.  The network will be an alternate route to transport data between New York City and the Washington, D.C., area.  It will cut through the City of York, house a data center at the old York Prison Site and create nearly 100 IT jobs with an average salary of $75,000.  The project will also provide a new high-speed network for local businesses.

This state of the art data center will be the first of a four data center system rollout in Pennsylvania with all four data centers expected to generate a *combined $2 billion in tax revenue to the Commonwealth over 30 years*.[]  The project will break ground in 2014 and be fully operational by late 2015.

(CRIZ Application at 4, R.R. 731a (emphasis in original).)

15

CRIZ application was unsuccessful and no construction of any sort had begun on the Property as of the date of trial, (N.T. at 294-95, 299, R.R. 300a-301a, 305a), the Authority contends that the CRIZ application was an example of overly optimistic civic boosterism with no concrete promise from the developers to actually build the data center or fiber-optic line. The Authority argues that the admission of the speculative CRIZ application into evidence was unfairly prejudicial because it led the jury to believe that a $40 million data center was definitely planned for the site, focusing on a hypothetical project with a high dollar amount that skewed the jury's fair market value determination.

We do not find an abuse of discretion by the Trial Court's admission of the CRIZ application into evidence. The Authority's secretary, Shilovsky Buffaloe, who signed the declaration of taking for the Property, testified that in his role working for the City of York he participated in the drafting of the CRIZ application and that he believed the document to be truthful. (N.T. at 306-08, R.R. 312a-314a.) Mr. Buffaloe testified that Think Loud had informed him that it was interested in acquiring the Property if the Authority was able to get possession of it and that Think Loud representatives had reviewed the CRIZ application prior to its submission in November 2013. (N.T. at 309-10, 312, R.R. 315a-316a, 318a.) Condemnees' valuation expert relied on the CRIZ application as evidence of Think Loud's interest in the Property and to show that the highest and best use of the Property was for the development of a data center by Think Loud. (N.T. 121-26, 131, R.R. 127a-132a, 137a.) The CRIZ application was thus relevant to show the Authority's interest in acquiring the Property prior to the date of condemnation, which demonstrated a potential use of the Property and demand for the Property. *Lower Makefield Township II*, 67 A.3d at 777 (trial court did not abuse its discretion in admitting a

16

letter from a developer containing an offer to purchase the condemned property for $8 million because it "was helpful in demonstrating the demand for the property"). Furthermore, the admission of the CRIZ application did not unfairly prejudice the Authority. While the CRIZ application may have ultimately been unsuccessful and construction on the data center had not commenced as of the date of the trial, the fact that the application was merely an aspirational document and not a promise of actual development was adequately presented at trial to the jury during testimony and closing arguments.

Accordingly, we conclude that the Trial Court properly exercised its discretion as the "gatekeeper of the evidence," *Lower Makefield Township II*, 67 A.3d at 778, in permitting the introduction of the CRIZ application and Redevelopment Agreement into evidence and by limiting the jury view to the exterior of the prison building based upon safety concerns. While the Authority was clearly in disagreement with the jury verdict of $1,250,000, this fair market value was in line with the opinion of Condemnees' qualified valuation expert. Both parties had the opportunity to present ample evidence regarding the condition of the building, its value based on comparable sales and the prospects and potential of the Property's redevelopment, and also to scrutinize and rebut the evidence presented by the other party. The fact that the jury elected to embrace Condemnees' position on the fair market value is insufficient reason to overturn the verdict and order a new trial.

The order of the Trial Court is affirmed.

_____
JAMES GARDNER COLINS, Senior Judge

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Condemnation by the :
Redevelopment Authority of the City :
of York :
:
Appropriating in Fee Simple :
Certain Lands of John E. and Joyce E. :
Gearhart : No. 186 C.D. 2017
:
Located at 319 Chestnut Street, in the City :
of York, York County, Pennsylvania :
Parcel No. 12-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.00-00000 :
:
Appeal of: Redevelopment Authority of the :
City of York :

# **O R D E R**

AND NOW, this 13th day of March, 2018, the order of the Court of Common Pleas of York County in the above-captioned case is AFFIRMED.

_____
JAMES GARDNER COLINS, Senior Judge